ORIGINAL

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

JUDGE BUCHWALD

11 CIV 0860

U.S. EDUCATION LOAN TRUST III, LLC, a
Delaware limited liability corporation, U.S.
EDUCATION LOAN TRUST IV, LLC, a Delaware
limited liability corporation,

CASE NO.

                Plaintiffs,

**JURY TRIAL DEMANDED**

      -against-

RBC CAPITAL MARKETS CORPORATION, a
Minnesota corporation, f/k/a RBC DAIN RAUSCHER
INC. d/b/a RBC CAPITAL MARKETS,

                Defendants.



RECEIVED
FEB 08 2011
U.S.D.C. S.D. N.Y.
CASHIERS

## COMPLAINT

Plaintiffs, U.S. EDUCATION LOAN TRUST III, LLC and U.S. EDUCATION LOAN
TRUST IV, LLC, through their undersigned counsel, hereby sue Defendant RBC CAPITAL
MARKETS CORPORATION f/k/a RBC DAIN RAUSCHER INC. d/b/a RBC CAPITAL
MARKETS ("RBC"), and states:

### NATURE OF THIS ACTION

1.    This is an action by Plaintiffs against RBC for damages suffered by them as a
result of a fraudulent scheme perpetrated by RBC in connection with its role as underwriter and
broker-dealer for auction rate securities ("ARS") issued by Plaintiffs.  Typically, ARS were
long-term bonds or notes that irrespective of their stated maturity date, traded through an auction
process as short term, highly liquid securities, with interest rates that were reset through auctions
that occurred on a 7 to 35 day basis, depending on the security.  As to this lawsuit, Plaintiffs
issued ARS backed by student loans, with RBC serving as Plaintiffs' underwriter and broker-

dealer, while otherwise being extremely active in the auction market acting in similar roles with many other ARS issuers.

2.      RBC both breached agreements executed in favor of Plaintiffs as described below, and fraudulently induced Plaintiffs into executing agreements that waived caps on interest rates that Plaintiffs were to pay investors on their ARS, arising out of RBC being in possession of non-public, material information about the pending collapse of the ARS auction market that occurred in February 2008, that it failed to disclose to Plaintiffs, along with other material non-disclosures, misrepresentations and breaches of duties.   The result of RBC's misconduct is that Plaintiffs lost over $100 million.   In addition, RBC breached its contract with Plaintiffs to remarket certain Reset Rate Notes which converted to ARS starting in November 2008, further injuring Plaintiffs.

**PARTIES**

3.      Plaintiff U.S. EDUCATION LOAN TRUST III, LLC ("USEL III") is a Delaware limited liability company, with its principal place of business located in Miami, Florida.   USEL III 's managing member is U.S. Education Finance III Management Corporation, a Delaware corporation.

4.      Plaintiff U.S. EDUCATION LOAN TRUST IV, LLC ("USEL IV") is a Delaware limited liability company, with its principal place of business located in Miami, Florida.   USEL IV's managing member is U.S. Education Finance IV Management Corporation, a Delaware corporation.   USEL III and USEL IV are collectively referred to below as USEL.

5.      Defendant RBC CAPITAL MARKETS CORPORATION, is a Minnesota corporation, formerly known as RBC DAIN RAUSCHER INC., also a Minnesota corporation doing business as RBC CAPITAL MARKETS, and which is also a wholly owned subsidiary of Royal Bank of Canada.   RBC is registered with the Securities and Exchange Commission

2

("SEC") as a broker-dealer pursuant to Section 15(b) of the Exchange Act, and is a member of the Financial Industry Regulatory Authority, Inc. ("FINRA"). RBC maintains its principal place of business, as well as its trading desk that was responsible for ARS, in New York, New York. At all times relevant hereto, RBC provided underwriting and remarking agent services for issuers of ARS, and both marketed ARS to many of its clients throughout the United States and bought ARS for its own account.

6.     Loren D. Carlson ("Carlson") was registered in the FINRA Central Registration Depository with CRD# 732744 from February 2004 through August 2008 with FINRA member firm RBC Capital Markets Corporation, FINRA CRD# 31194. D. Grant Carwile ("Carwile") is a Managing Director in the New York Municipal Finance office of RBC Capital Markets, LLC and is registered in the FINRA Central Registration Depository with CRD# 2561182. Richard T. Koster, Jr. ("Koster") is a Vice President in the Charleston, South Carolina office of RBC Capital Markets, LLC and is registered in the FINRA Central Registration Depository with CRD# 4234630.     Brian M. Miller ("Miller") was registered in the FINRA Central Registration Depository with CRD# 4671236 from February 2004 through September 2008 with FINRA member firm RBC Capital Markets Corporation in Charleston, South Carolina.     Jeff Doty ("Doty") is a Managing Director of Money Market Trading in the New York office of RBC Capital Markets, LLC. At all times pertinent hereto, Carlson, Carwile, Koster, Miller and Doty were authorized agents of RBC and as such, all promises, representations, acts, and omissions on the part of each of them in their dealings with the Plaintiffs are attributable to RBC.

## JURISDICTION AND VENUE

7.     This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. §§1331 and 1332 as it is brought between USEL III and USEL IV and RBC who are citizens of

different states, as stated above. The amount in controversy exceeds $75,000, exclusive of interest, costs and attorneys' fees.

8. Venue is proper in this district pursuant to 28 U.S.C. §1391 as the acts complained of below that give rise to the claims in this lawsuit, occurred in this district. Further, RBC maintains its principal executive business office in this district. Finally, certain operative agreements related to USEL III and USEL IV provide: "The parties agree that all actions and proceedings arising out of the Agreement or any of the transactions contemplated hereby shall be brought in the federal and/or state courts located in the County of New York and, in connection with any such action or proceeding, submit to the jurisdiction of, and venue, in such court." Another operative contract in this action involving all parties is a Remarketing Agreement which provides that it "shall be governed by and construed in accordance with the laws of the State of New York."

## GENERAL FACTUAL ALLEGATIONS

### RBC Underwrote USEL's ARS and Reset Rate Notes

9. Beginning on June 23, 2004 for USEL III[1] and continuing through March 9, 2006,[2] March 13, 2006,[3] September 26, 2006[4] and October 18, 2007[5] for USEL IV's respective

---

[1] Senior Series 2004A-1 Notes, Senior Series 2004A-2 Notes, Senior Series 2004A-3 Notes (Reset Rate Notes), and Subordinate Series 2004B Notes.

[2] Senior Series 2006-1A-1 Notes, Senior Series 2006-1A-2, and Senior Series 2006-1A-3 Notes.

[3] Senior Series 2006-1A-4 Notes, Senior Series 2006-1A-5 Notes, Senior Series 2006-1A-6 Notes, Senior Series 2006-1A-7 Notes, Senior Series 2006-1A-8 Notes, Subordinate Series 2006-1B-1 Notes, and Subordinate Series 2006-1B-2 Notes.

[4] Senior Series 2006-2A-1 Notes, Senior Series 2006-2A-2 Notes, Senior Series 2006-2A-3 Notes, Senior Series 2006-2A-4 Notes, Senior Series 2006-2A-5 Notes, Senior Series 2006-2A-6 Notes, Senior Series 2006-2A-7 Notes, and Subordinate Series 2006-2B-1 Notes.

[5] Senior Series 2007-1A1-1 Notes, Senior Series 2007-1A1-2 Notes, Senior Series 2007-1A1-3 Notes, Senior Series 2007-1A1-4 Notes (Reset Rate Notes), and Senior Series 2007-1B1-1 Notes (Reset Rate Notes).

issuances of ARS or Reset Rate Notes (the "Notes"), RBC agreed through a series of Note Purchase Agreements, to act as the underwriter (the "Initial Purchaser") for each of the issuances of USEL's Notes, as indicated by the footnotes in this paragraph for each relevant date. The Note Purchase Agreements are not attached to the Complaint, because they are merely evidentiary in nature, rather than being operative documents upon which a claim is founded.

10.    Pursuant to each of the Note Purchase Agreements and their related Private Placement Memorandum, RBC agreed to purchase USEL's Notes for offering to investors. For each issuance of Notes by USEL, RBC: (a) in its roles as broker-dealer, remarketing agent and marketing agent for the Notes and their related auctions, advised USEL about the structure of the issuance, (b) agreed to conduct interest rate auctions on USEL's ARS, and (c) prepared the respective Private Placement Memorandum for distribution to investors.

11.    Following a series of transactions over the years, a strong relationship founded on trust developed between Carlson and Mr. Henry B. Howard ("Howard"), USEL's Chairman, President and Chief Executive Officer, and USEL's management, such that RBC's advisory relationship with USEL evolved beyond a mere contractual arms-length relationship. As a result of this close relationship, where Carlson served as an advisor and architect of numerous transactions, including those described in this Complaint, USEL was induced to and did place great trust and confidence in Carlson and RBC, relying heavily upon their knowledge and expertise to advise USEL as to the auctions and sales of USEL's Notes, expecting RBC to engage in honest dealings with USEL, always keeping in mind USEL's best interests. This close and trusting relationship between RBC and USEL (principally between Carlson and Howard), led to RBC's appointment as broker-dealer, underwriter, remarketing agent and market agent for

USEL's Notes and gave RBC substantial control over the auctions of USEL's ARS, as described below.

12.    In ARS transactions involving USEL's ARS, RBC as broker-dealer, acted as the auction facilitator by routinely injecting capital liquidity into the auctions, as necessary, to enable RBC to market USEL's securities to investors.  In this capacity, RBC was the interface between USEL and investors by submitting a "Clearing Bid" at USEL's auctions that it managed, to avoid auction failures where the supply of sell orders from ARS holders exceeded investor demand of buy orders.  RBC was the broker-dealer for about 90% of USEL's ARS auctions.

## ARS Auction Procedures

13.    At a USEL ARS "Dutch auction," each potential investor's bid was submitted through RBC.  Each bid, based on interest rate and amount of securities to be purchased, was then ranked from lowest minimum bid rate to highest minimum bid rate and then orders for the particular security were filled, beginning with the lowest bid submitted, until all available securities were sold.  Further, existing ARS investors could bid to sell ("Sell Order"), hold ("Hold Order") or buy more ("Buy Order") of a particular ARS.

14.    In a successful auction, the lowest bid rate at which all the ARS could be sold at par (100 cents on the dollar), established the ARS's interest rate, predominantly known as the "Clearing Rate" (also known as the "Auction Rate").  The Clearing Rate was paid on the entire series of ARS for the successive 28 day period (the "Auction Period") which varied depending on the issued security.  At each successive successful auction, investors who submitted a Buy Order at a minimum rate above the Clearing Rate did not succeed in acquiring ARS, while those who submitted Buy Orders with minimum bid rates at or below the Clearing Rate, earned that rate for the next Auction Period.

15.   If an existing investor or holder did not submit a sell order for their ARS at an auction, then a Hold Order was deemed to have been submitted by such investor for the next Auction Period. If all outstanding ARS were subject to Hold Orders, then the "All Hold Rate" applied to all of the particular ARS. The All Hold Rate equaled 90% of One-Month LIBOR and this was the interest rate USEL was obligated to pay investors until the next auction date. The Indenture for each series of ARS determined that every auction also had a cap on the interest rate that could be paid by an issuer of an ARS, commonly known as the "Maximum Rate," irrespective of the Clearing Rate. In the instant case, pursuant to the "Auction Procedures" set forth in both the USEL III and USEL IV First Supplemental Indentures of Trust which governed the auctions of USEL's ARS, the Auction Period Rate for USEL's ARS could not exceed the applicable Maximum Rate.

16.   A failed auction occurred when there were not enough Buy Orders to satisfy the positions of interested sellers and the broker-dealer failed to serve as the back-stop purchaser and submit a Clearing Bid for the remaining Sell Orders to avoid the failed auction. A failed auction caused a penalty rate of interest, being the Maximum Rate, to be imposed on the ARS issuer. Successive failed auctions imposed the Maximum Rates on the issuer until a new Auction Rate below the Maximum Rate was established by a successful auction. Alternatively, if, at the close of the successive Auction Period, no Sell Orders were submitted to the broker-dealer, then the All Hold Rate would be set for the outstanding ARS for the successive Auction Period.

17.   RBC, as USEL's broker-dealer, conducted ARS auctions for USEL every 28 days pursuant to the Auction Procedures set forth in each of the respective First Supplemental Indenture of Trust documents, which are not attached to the Complaint, because they are merely evidentiary in nature, rather than being operative documents upon which a claim is founded. As

7

stated above, RBC's primary role as broker-dealer was to ensure successful auctions, providing the capital for a Clearing Bid as necessary. The Clearing Bid was essential to fill the gap between the Sell Orders and the Buy Orders for those securities. As stated in USEL III's and USEL IV's virtually identical Private Placement Memoranda, "[t]he Broker-Dealer may routinely place one or more Bids in an Auction for its own account ... to prevent an Auction failure (which would result in the Auction Rate being set to the Maximum Rate) or to prevent an Auction from clearing at a rate that the Broker-Dealer believes does not reflect the market ..." These Private Placement Memoranda are also not attached to the Complaint, because they are merely evidentiary in nature, rather than being operative documents upon which a claim is founded.

## RBC's Duties as Broker-Dealer and Remarketing Agent to USEL III

18.    On or about June 1, 2004, RBC and USEL III, though its agent The Bank of New York ("BONY"), entered into a Broker-Dealer Agreement (the "Broker-Dealer Agreement") attached as **Exhibit A**, whereby RBC agreed to act as broker-dealer to manage USEL III's ARS auctions. BONY entered into the Broker-Dealer Agreement with RBC at the direction of USEL's "Authorized Issuer Officer," Howard.

19.    Also on or about June 1, 2004, RBC and USEL III entered into a Remarketing Agreement, attached as **Exhibit B**, whereby RBC agreed to serve as USEL III's remarketing agent for USEL's Reset Rate Notes, which unless remarketed, were to convert to ARS at the end of their respective "Floating Rate Term."

20.    To create USEL III's ARS, which were backed by student loans, on June 1, 2004, USEL, III, as Issuer and BONY as Eligible Lender Trustee, issued an Indenture of Trust (the "Indenture") to BONY as Trustee. The Indenture assigned certain Federal Family Education

8

Loan Program ("FFELP") student loans owned by each of the respective Trusts to USEL to back the Notes. The FFELP loans backing the Notes, unlike mortgage-backed securities or other securitized debt obligations which were sold as ARS, were and are performing loans that continue to pay principal and interest, as these loans are insured as to 98% of principal and interest by the United States Department of Education. The Notes (ARS or Reset Rate Notes) were issued in accordance with the terms stated in the Indenture, the First Amended Supplemental Indenture of Trust ("First Supplemental Indenture") and successive supplemental indentures which, among other things, set the rates of interest paid on the Notes sold as ARS. The First Supplemental Indenture also set forth the Auction Procedures described above.

21.     Also on or about June 1, 2004, USEL III and BONY, as Trustee under the Indenture, entered into an Auction Agent Agreement authorizing BONY as Auction Agent to implement the Auction Procedures for the auctions of USEL's ARS.

22.     Also on June 1, 2004, USEL III and BONY, as Market Agent, entered into a Market Agent Agreement where RBC agreed to its appointment by USEL as the Market Agent for USEL III's ARS, in accordance with the terms of the Indenture.

23.     BONY's role as Trustee and Auction Agent was ministerial in function. RBC and USEL communicated directly about the auctions of USEL III's ARS managed by RBC, and USEL III, not BONY, made all material decisions about its ARS, including whether to allow for increases to the Maximum Rates paid by USEL on its ARS at auctions managed by RBC. In short, BONY acted at the instruction of USEL in respect of USEL's ARS.

24.     The series of ARS and Reset Rate Notes created by the Indenture included: Series 2004-1 A-1 Notes with a principal amount of $85,600,000; Series 2004-1 A-2 Notes with a principal amount of $85,600,000; Series 2004-1 A-3 Notes with a principal amount of

$150,000,000 (the Reset Rate Notes); and, Series 2004B Notes with a principal amount of $20,000,000 (collectively, the "Series 2004 Notes"). The Series 2004-1, A-2, and A-3 Notes were "Senior Student Loan Backed Notes" and the Series 2004B were "Subordinate Student Loan Backed Notes." In sum, the Series 2004 Notes were issued by USEL and RBC acted as underwriter, broker-dealer and remarketing agent, and RBC agreed to conduct ongoing interest rate auctions, including for the following securities:

Closing Date: June 24, 2004

| | | |
|---|---|---|
| 2004-1 A-1 | $ 85,600,000 | Senior Student Loan Backed Notes (ARS) |
| 2004-1 A-2 | $ 85,600,000 | Senior Student Loan Backed Notes (ARS) |
| 2004-1 A-3 | $150,000,000 | Senior Reset Rate Notes[6] |
| 2004B | $ 20,000,000 | Subordinate Student Loan Backed Notes (ARS) |
| | $341,200,000 | |

25.     The Series 2004-1 Notes, Series 2004-1 A-2 Notes, and Series 2004B Notes were issued as ARS. The Series 2004A-3 Notes were initially issued as Reset Rate Notes which paid an interest rate (the "Floating Rate") pegged to LIBOR and a "Spread Factor" which was recalculated (reset) every three months until June 1, 2009. The period of time running from their issuance on June 1, 2004 through June 1, 2009, was known as the "Floating Rate Term" for the Series 2004-1 A-3 Notes.

26.     RBC agreed in the Remarketing Agreement to remarket the Series 2004-1 A-3 Reset Rate Notes before they converted into ARS on or about June 2, 2009. Pursuant to the terms of the Indenture, as amended, at the end of the initial Floating Rate Term, unless these notes were remarketed by RBC and a new Floating Rate Term was established by the execution of a Remarketing Agreement Confirmation, the Series 2004-1 A-3 Reset Rate Notes

---

[6] Reset Rate Notes which converted to ARS on June 1, 2009.

automatically converted to ARS, and were subject to the same Auction Procedures as the other Series 2004 Notes.

27.    Despite the contractual requirement that "the Remarketing Agent shall offer for sale and use its best efforts to sell such Reset Rate Notes," RBC waived until May 5, 2009 to inform USEL by email from Koster to Howard, that RBC had not remarketed the Series 2004-1 A-3 Reset Rate Notes. Given RBC's failure to remarket the Series 2004-1 A-3 Reset Rate Notes, on or after June 1, 2009, the entire $150,000,000 of Series 2004A-3 Reset Rate Notes converted to ARS. Conversion of the Series 2004-1 A-3 Reset Rate Notes to ARS meant that the interest rate payment on these notes made to investors by USEL increased from a rate of three-month LIBOR plus 25 basis points, to at a minimum rate of one-month LIBOR plus 150 basis points; an increase of close to 125 basis points.

## RBC's Duties as Broker-Dealer and Remarketing Agent to USEL IV

28.    On or about March 1, 2006, and again on September 1, 2006, RBC and USEL IV, though its agent BONY, entered into a Broker-Dealer Agreement (the "USEL IV Broker-Dealer Agreement") attached as **Exhibit C**, whereby RBC agreed to act as broker-dealer to manage USEL IV's ARS auctions. BONY entered into the USEL IV Broker-Dealer Agreement with RBC at the direction of USEL's "Authorized Issuer Officer," Howard. The Broker-Dealer Agreement and the USEL IV Broker-Dealer Agreement are collectively sometimes referred to below as the "Broker-Dealer Agreements."

29.    To create USEL IV's ARS, which were also backed by student loans, on March 1, 2006, USEL IV, as Issuer and BONY as Eligible Lender Trustee, issued an Indenture of Trust (the "USEL IV Indenture") to BONY as Trustee. The USEL IV Indenture assigned certain FFELP student loans owned by the Trust to USEL IV to back the ARS and Reset Rate Notes

issued by USEL IV (the "USEL IV Notes"). The FFELP loans backing the USEL IV Notes, also were and are performing loans which continue to pay principal and interest, as these loans are insured as to 97% or 98% of principal and interest by the United States Department of Education. The USEL IV Notes were issued in accordance with the terms stated in the USEL IV Indenture, its First Amended Supplemental Indenture of Trust ("USEL IV First Supplemental Indenture") and successive supplemental indentures which, among other things, set the rates of interest paid on the USEL IV Notes sold as ARS. The USEL IV First Supplemental Indenture also set forth the Auction Procedures described above, which were identical to the USEL III procedures. The Indenture and the USEL IV Indenture are collectively sometimes referred to below as the "Indentures." Similarly, the First Supplemental Indenture and the USEL IV First Supplemental Indenture are collectively sometimes referred to below as the "Supplemental Indentures." Further, the Notes and the USEL IV Notes are collectively sometimes referred to below as the "Notes."

30.     Also on or about March 1, 2006, USEL IV and BONY, as Trustee under the USEL IV Indenture, entered into an Auction Agent Agreement authorizing BONY as Auction Agent to implement the Auction Procedures for the auctions of USEL IV's ARS.

31.     Further, on March 1, 2006, BONY as Trustee for USEL IV and RBC, as Market Agent, entered into a Market Agent Agreement where RBC agreed to its appointment by USEL IV as the Market Agent for USEL VI's ARS in accordance with the terms of the USEL IV Indenture.

32.     Again, BONY's role as Trustee and Auction Agent was ministerial in function. RBC and USEL IV communicated directly about the auctions of USEL IV's ARS managed by RBC, and USEL IV, not BONY, made all material decisions about its ARS, including whether to

allow for increases to the Maximum Rates paid by USEL on its ARS at auctions managed by RBC. In short, BONY acted at the instruction of USEL in respect of USEL's ARS.

33.     Relevant to this lawsuit, the ARS issued by USEL IV for which RBC acted as underwriter, ongoing broker-dealer and market agent and agreed to conduct ongoing interest rate auctions, include the following:

**Series 2006-1**

_Closing Date: March 14, 2006_

| | | |
|---|---|---|
| 2006-1A-1 | $105,700,000 | Senior Libor-indexed Notes |
| 2006-1A-2 | $312,500,000 | Senior Libor-indexed Notes |
| 2006-1A-3 | $211,800,000 | Senior Libor-indexed Notes |
| 2006-1A-4 | $ 98,000,000 | Senior Auction Rate Securities (ARS) |
| 2006-1A-5 | $ 98,000,000 | Senior Auction Rate Securities (ARS) |
| 2006-1A-6 | $ 98,000,000 | Senior Auction Rate Securities (ARS) |
| 2006-1A-7 | $ 64,000,000 | Senior Auction Rate Securities (ARS) |
| 2006-1A-8 | $ 64,000,000 | Senior Auction Rate Securities (ARS) |
| 2006-1B-1 | $ 27,000,000 | Subordinate Auction Rate Securities (ARS) |
| 2006-1B-2 | $ 27,000,000 | Subordinate Auction Rate Securities (ARS) |
| | $1,106,000,000 | |

**Series 2006-2**

_Closing Date: September 27, 2006_

| | | |
|---|---|---|
| 2006-2A-1 | $125,000,000 | Senior Libor-indexed Notes |
| 2006-2A-2 | $ 80,000,000 | Senior Auction Rate Securities (ARS) |
| 2006-2A-3 | $ 80,000,000 | Senior Auction Rate Securities (ARS) |
| 2006-2A-4 | $ 65,000,000 | Senior Auction Rate Securities (ARS) |
| 2006-2A-5 | $ 60,000,000 | Senior Auction Rate Securities (ARS) |
| 2006-2A-6 | $ 75,000,000 | Senior Auction Rate Securities (ARS) |
| 2006-2A-7 | $ 75,000,000 | Senior Auction Rate Securities (ARS) |
| 2006-2B-1 | $ 40,000,000 | Subordinate Auction Rate Securities (ARS) |
| | $600,000,000 | |

**Series 2007-1**

_Closing Date: October 19, 2007_

| | | |
|---|---|---|
| 2007-1A-1 | $ 55,000,000 | Senior Libor-indexed Notes |
| 2007-1A-2 | $285,000,000 | Senior Libor-indexed Notes |
| 2007-1A-3 | $160,000,000 | Senior Libor-indexed Notes |
| 2007-1A-4 | $250,000,000 | Senior Reset Rate Notes[7] |
| 2007-1B-1 | $ 30,000,000 | Subordinate Reset Rate Notes[8] |

[7] Reset Rate Notes which converted to ARS on November 30, 2010.
[8] Reset Rate Notes which converted to ARS on November 30, 2008.

13

$780,000,000

34.     USEL IV's Fourth Supplemental Indenture of Trust dated October 1, 2007 for the closing on October 19, 2007, created the Reset Rate Notes for USEL IV's Series 2007-1A-4 Notes and Series 2007-1B-1 Notes (the "Series 2007-1 Reset Rate Notes") which were also issued by and through its underwriter, RBC. Pursuant to the Private Placement Memorandum for the Series 2007-1 Notes, RBC was also appointed as the Remarketing Agent for the Series 2007-1 Reset Rate Notes.

35.     The Private Placement Memorandum provided that the interest paid on the Series 2007-1 Reset Rate Notes was indexed and included a Spread Factor for Series 2007-1A-4 of 0.35%, and a Spread Factor for the Series 2007-1B-1 Notes of 1.50%, during the Floating Rate Term of the Reset Rate Notes before conversion to ARS, if a Subsequent Floating Rate Term(s) was not established.

36.     Remarketing the Series 2007-1 Reset Rate Notes would have avoided their conversion to ARS on November 30, 2008 for the $30,000,000 of Series 2007-1B-1 Notes and November 30, 2010 for the $250,000,000 of Series 2007-1A-4 Notes. Again, despite its obligation to act as remarketing agent for USEL's Reset Rate Notes, RBC failed to remarket either series which resulted in their conversions to ARS and USEL being saddled thereafter with increased interest payments of over 100 basis points.

**RBC's Statutory and Contractual Duties to USEL**

37.     Even though USEL pleads no causes of action herein alleging federal statutory securities claims, at all times pertinent hereto, RBC was required to comply with the general anti-fraud provisions of the federal and state securities laws, and the rules regulating its conduct as a FINRA registered broker-dealer. It is common knowledge and a fact that these laws

14

generally prohibit misstatements or misleading omissions of material facts, or otherwise engaging in fraudulent or manipulative acts and practices, in connection with the purchase or sale of securities. Thus, these laws create a standard for broker-dealer conduct and duties. In addition, RBC owed USFL a duty of good faith and fair dealing consistent with the standards of the securities broker-dealer profession with an affirmative duty by RBC to assure that its employees and agents complied with all applicable securities regulations. RBC's duties as a broker-dealer include, but are not limited to: the duties to execute orders promptly, disclose certain material information (i.e., information the customer would consider important), charge prices reasonably related to the prevailing market, fully disclose any conflict of interest, and not engage in self-dealing. Furthermore, as a member of FINRA, RBC must comply with NASD's Rules of Fair Practice. These rules require broker-dealers to observe high standards of commercial honor and observe just and equitable principles of trade in conducting their business.

38.     Consistent with the aforementioned obligations, RBC further agreed in the operative Broker-Dealer Agreements that its performance as broker-dealer "will not conflict with, or result in a violation of, the terms, conditions or provisions of, or constitute a default under, any law, decree, order, rule or regulation of any court or governmental agency having jurisdiction over [RBC], or any agreement, indenture, instrument, mortgage or undertaking to which [RBC] is a party or by which it is bound."

### RBC Is Twice Found By The SEC To Have Engaged In ARS Related Fraudulent Practices

39.     On or about June 3, 2009, the Securities and Exchange Commission filed a civil complaint (the "SEC Complaint") against RBC for its unlawful conduct as broker-dealer and remarketing agent for ARS auctions that it managed. The SEC charged RBC with failing to inform its customers that it was planning to exit the ARS auction market, while simultaneously

misrepresenting its stability.  In effect, this is the gravamen of USEL's charges against RBC in this lawsuit.  Ultimately, RBC's was found to have violated Section 15(c) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §78o(c)] which prohibits the use of manipulative or deceptive devices by broker-dealers.

40.     The SEC found that from the fall of 2007 through early 2008, RBC established a "Management Group" which, through RBC's unique dual positions as broker-dealer and remarketing agent, studied and then concluded that the student loan ARS market was suffering from deteriorating market conditions and falling customer demand at the auctions it managed.

41.     Paragraph 18 of the SEC Complaint alleges:

As a result of these circumstances, in November 2007, RBC assembled a group of senior managers ("Management Group"), including representatives from its parent bank, to discuss the Firm's credit, risk, and business strategy and overall business plan in the ARS market, particularly with respect to student loan ARS. The Management Group monitored the ARS market and RBC's inventory on a daily or near-daily basis. Throughout the rest of 2007 until the February 2008 ARS auction failures, RBC's Management Group recognized that if the Firm could not stem the rise in its ARS inventory, then RBC would eventually have to cease making Clearing Bids for its auctions. The Management Group also recognized that discontinuing its practice of placing Clearing Bids would result in the failure of many RBC-managed auctions, which had never before occurred in the more than twelve years that RBC had acted as remarketing agent for ARS. Certain members of the Group further expected that a failure of ARS auctions managed by RBC or another sizeable ARS remarketing agent would lead to widespread failure across the ARS market. This expectation proved to be correct once auction failures began in early February 2008, as firms in rapid succession ceased placing Clearing Bids for the ARS auctions they managed.  Among the matters discussed by the Management Group were whether RBC should be the first broker-dealer to discontinue the longstanding market practice of placing Clearing Bids at auctions for which it acted as lead remarketing agent; the impact that auction failure would have, both on its business and its customers; what liability RBC might have to customers; and even whether RBC should exit the ARS business entirely. The Management Group also planned for the aftermath of auction failure by devising external communications strategies and drafting internal talking points to be used if failure occurred for ARS auctions managed by RBC or another firm. (emphasis added).

42.     The SEC also asserted that RBC knew but failed to disclose to its customers, the "significant and increasing risks associated with ARS" during the period leading up to the ARS failures in February 2008. The SEC Complaint resulted in a Judgment entered against RBC on June 9, 2009 ("SEC 2009 Judgment"), and which included an admission that the SEC charges were true.

43.     The SEC Complaint and SEC 2009 Judgment followed the SEC previously fining RBC for fraudulent practices by failing to disclose its participation in ARS auctions it managed as broker-dealer. In a May 31, 2006 *Order Instituting Administrative and Cease-And-Desist Proceedings, Making Findings, and Imposing Remedial Sanctions and A Cease-And-Desist Order Pursuant to Section 8A of the Securities Act of 1933 and Section 15(b) of the Securities Exchange Act of 1934* (the "SEC 2006 Order"), the SEC found that RBC collaborated with certain customers by: (1) having the investor submit its bid at a lower rate than the investor actually wanted to receive, allowing the auction to clear at the lower rate, buying the securities from the investor after the auction, and then selling the securities back to the investor at below par value; (2) displacing an investor's bid and then compensating the investor by selling securities to the investor at below par value in the secondary market; and (3) providing a higher return by delaying the settlement date for certain investors.

44.     The SEC's findings demonstrated that RBC manipulated the ARS auction market to earn higher interest rates than RBC would have otherwise obtained. RBC's "violative practices" were deemed to have "affected the clearing rate" and the SEC 2006 Order states: "in those instances when the [violative] practices raised the clearing rate, issuers had to pay a higher interest rate or yield." RBC was fined, censured and ordered to "cease and desist" from these practices in the future. However, notwithstanding RBC's admitted market manipulation and

fraudulent conduct, RBC continued to engage in virtually the identical illegal conduct to increase the Clearing Rate at auctions of USEL's ARS up and until February 2008, when RBC ceased providing Clearing Bids and almost immediately thereafter, the entire ARS auction market collapsed. USEL asserts that RBC's previously acknowledged fraudulent conduct represented by the SEC findings, supports an award of punitive damages for USEL, since the conduct charged in both instances is nearly identical such that RBC continued its predatory course of conduct after it was punished by the SEC.

45.     Further, the New York Attorney General also instituted proceedings against RBC for unlawful conduct related to the ARS market. In *In re RBC Capital Markets Corporation*, on June 2, 2009, RBC agreed to an "Assurance of Discontinuance Pursuant to Executive Law §63(15)" which stipulated:

> From the Fall of 2007 through February of 2008, demand for auction rate securities continued to erode and RBC's auction rate securities inventory reached unprecedented levels. RBC was aware of the increasing strains on the auction rate securities market, increasingly questioned the viability of the auction rate securities market and planned for widespread market failure. RBC did not disclose these increasing risks to of owning or purchasing auction rate securities to all of its customers.

In these New York proceedings, RBC agreed to pay a $9.8 million fine and was required to refund underwriting fees to certain issuers of ARS for whom RBC acted as underwriter for the refinancing and conversion of ARS that occurred after February 11, 2008.

46.     Similarly, rather than disclose to USEL that its auctions were met with diminished customer demand, as further described below, RBC manufactured a plan to increase the amount of ARS it purchased for its own account, then to maximize the interest rates paid to RBC by USEL on its ARS by inducing increases to the Maximum Rates, all before withdrawing its support for the auctions it managed and controlled. As a result, RBC's conduct materially

caused auction failures. RBC's conduct fell squarely within the illegal acts described above related to the SEC and New York attorney general proceedings.

## RBC's Fraudulent Practices Directed At USEL

47. For several years, USEL's ARS auctions were successful and, consistent with both RBC's course of performance and representations that it would submit Clearing Bids when necessary for the auctions it managed, the Auction Rate for USEL's ARS typically equaled one-month LIBOR, plus 1 to 5 basis points. However, as described below, once RBC induced USEL into agreeing to issue waivers which increased the amount of interest paid on USEL's ARS to the Maximum Rate, RBC illegally profited at USEL's expense and abrogated its responsibilities as broker-dealer.

48. Despite RBC being acutely aware of its obligations not to manipulate the ARS auction process, just as RBC misrepresented the stability of ARS auctions to its investor clients, RBC similarly made the same misrepresentations to USEL, while also failing to disclose to USEL the analysis and conclusions of its Management Group. Thus, through its manipulations as described below, RBC increased the amount and value of the ARS that RBC purchased for its own account. In essence, armed both with the conclusion that the ARS market would collapse and being a controlling party in allowing the market to collapse, to USEL's material financial detriment, RBC induced USEL into waiving the interest caps that USEL's ARS would pay.

49. In late September 2007, in conjunction with the issuance of the $780,000,000 in the Series 2007-1 Notes described above, RBC's Managing Director and primary point of contact with USEL, Carlson, telephoned Howard to ask for the execution of a Third Supplemental Indenture of Trust by USEL IV (the "First Waiver") in order to permit a 30 day waiver period of the limitations on interest rates paid to investors in USEL IV's ARS. For

several years, Carlson had advised USEL in great detail about the ARS auctions that RBC conducted for USEL and other student loan related investment trusts managed by Howard and USEL. Carlson represented to Howard that RBC needed the assistance of USEL as its partner in the ARS market. Through this longstanding relationship, Carlson and RBC worked hard to build up and intentionally engender great trust, confidence and belief by USEL and Howard that RBC was indeed USEL's partner in the ARS market and as a result, USEL agreed to issue the First Waiver.

50.     Specifically, in this late September 2007 telephone call, Carlson represented to Howard that in order to attract investors to the auctions of USEL's ARS, USEL had to temporarily allow the ARS to pay higher interest. Carlson further represented that if USEL agreed to the First Waiver, RBC would work to continue to ensure successful auctions and that the First Waiver was only needed on a temporary basis to bolster investor demand. Neither at that time or thereafter, did Carlson or any other RBC agent disclose to Howard or USEL of RBC's forming belief that ARS market could fail or showed other signs of serious trouble. In reliance on Carlson's representations, USEL executed the First Waiver. The 30 day period covered by the First Waiver ran from October 1, 2007 until October 31, 2007 (the "First Waiver Period"). During this period, the Maximum Rate (the "First Waiver Rate"), was set to (a) one month LIBOR plus 150 basis points on Senior ARS, and (b) one month LIBOR plus 250 basis points on Subordinate ARS. USEL's ARS interest rates immediately shot up 150 basis points once the First Waiver was agreed to.

51.     Near the end of the First Waiver Period, Carlson again telephonically contacted Howard and requested a second, temporary waiver of the interest rate limits on USEL IV's ARS. Making the same representations and providing the same inducement as to the First Waiver,

Carlson asked USEL IV to execute the Fifth Supplemental Indenture of Trust (the "Second Waiver") in order to permit another limited waiver period. By this time, RBC had internally became more acutely aware of and knowledgeable about market factors indicating serious problems with the ARS action market process, yet RBC did not directly disclose any fact or issue related thereto, to USEL. Following up Carlson's call to Howard, on October 25, 2007, Miller sent an e-mail to Howard to ask for another "Maximum Rate amendment for Trust IV," indicating only limited or temporary issues in the auction rate markets, stating:

> We continue to have selling pressure in the auction rate markets, thus extending the need for a maximum rate amendment. For example, the CP Cap which is still in place on the 2006-1 and 2006-2 Notes was calculated to be 5.77% on a subordinate tranche that auctioned yesterday. As you are well aware, the clearing rate for subordinate 144A auction notes is over 6%. Had the maximum rate waiver not been in-place (instituted by the Third Supplemental Indenture to Trust IV) we would have had a situation yesterday where the maximum rate was approximately 40 basis points below the market clearing rate. The waiver period related to the Third Supplemental expires on October 31st. As we have done for many of our other clients, we would like to pursue another waiver by way of a Fifth Supplemental Indenture in which the Maximum Rate is equal to LIBOR plus 1.50% for seniors, and LIBOR plus 2.50% for subs and the Net Loan Rate will equal the Maximum Rate (these are just like we did in the Third Supplemental).

> We have already spoken with the rating agencies and they are willing to grant a 2 month waiver, thus covering us through December 31st, assuming we execute the Fifth Supplemental November 1st. With your approval, can we ask Greenberg to start drafting a Fifth Supplemental?

The Second Waiver covered the period from October 30, 2007 until January 1, 2008 (the "Second Waiver Period").

52.     In response to the request for the Fifth Supplemental Indenture [the Second Waiver], on October 25, 2007, Howard asked for an explanation as to why USEL's ARS were being acquired at such high interest rate levels: "I please would like a written explanation from RBC as to why the auction rate securities RBC handles are pricing at spreads twice as high over LIBOR vis a vis other dealers." In response to Howard's request for an explanation, rather than

21

admit to Howard that RBC itself was seeking the interest rate waiver so it could extract the higher interest payments directly from USEL, Carlson misrepresented to Howard:

> The written explanation that I can give is that our rates are where they are because we are working to keep an orderly auction markets [sic.] in student loans. From what my desk is telling me we are very much in line with the other major auction Firms in the student loan business. One of our major student loan competitors, who is owned by a Swiss Bank had two of its non-profit state issuers at 6:00% last week. The auction market has not responded from the September high's and we are not sure presently what will bring the buyers back. Over $6 billion of failed auctions in August and September have sent many investors to other securities. The subordinate auction market is closed and we are now holding in inventory approximately 90% of our outstanding book. This whole market needs attention. The only aggressive players in this market are the Firms that are not on many broker-dealer auctions and are trying to buy business. We are asking for this waiver to keep our market orderly and not have any problems in the student loan business. One suggestion for U.S Education Trust IV would be to put Moody's back in as some auction buyers do need Moody's.

53.   What Carlson and RBC misrepresented and failed to disclose to USEL is that Carlson's explanation that the waivers were necessary to "keep our market orderly and not have any problems in the student loan business" really meant that RBC was controlling the Clearing Rates and desired the Waivers so RBC could drive up the interest rates to the new and much higher Maximum Rates on ARS that RBC already purchased and further, intended to purchase for its own account, unbeknownst to USEL.

54.   Simultaneously with inducing the Second Waiver, RBC asked that USEL III agree to a similar waiver of interest rate caps for USEL's ARS. Accordingly, based on the representations made by Carlson and Miller, USEL III agreed to a Second Supplemental Indenture of Trust (the "Third Waiver"). The Third Waiver covered the period from November 5, 2007 until December 5, 2007 (the "Third Waiver Period") for USEL III's ARS. During both the Second Waiver Period and the Third Waiver Period, the Maximum Rate (the "Second Waiver Rate" and "Third Waiver Rate"), which, like the First Waiver Rate, was set to one month

22

LIBOR plus 150 basis points on Senior ARS and one month LIBOR plus 250 basis points on Subordinate ARS. USEL's ARS interest rates immediately shot up 150 basis points.

55.     By November 2007, it is indisputable that RBC, through its Management Group, internally conclusively determined that the ARS auction market was doomed and that it was going to stop supporting the auction process. Nevertheless, without divulging this absolutely critical and relevant information, Carlson again contacted Howard and requested an additional temporary waiver of the interest rate limits on USEL III's ARS. Miller then asked that USEL III execute the Third Supplemental Indenture of Trust (the "Fourth Waiver") in order to permit a waiver of USEL III's ARS interest rates caps to occur from December 21, 2007 through January 31, 2008 (the "Fourth Waiver Period"), for the same reasons as stated when seeking the First Waiver, Second Waiver and Third Waiver. For the Fourth Waiver Period, the Maximum Rate (the "Fourth Waiver Rate") during the Fourth Waiver Period was set to an increased rate that equaled one month LIBOR plus 300 basis points on Senior ARS and equaled LIBOR plus 350 on Subordinate ARS. USEL's ARS interest rates immediately shot up an additional 150 basis points.

56.     Likewise, again without divulging RBC's Management Group conclusions, before the expiration of the Second Waiver Period which effected USEL IV's interest rates, and making the same consistent representations identified above, Carlson sought and USEL IV agreed to and executed a Sixth Supplemental Indenture of Trust (the "Fifth Waiver" together with the First Waiver, Second Waiver, Third Waiver, and Fourth Waiver, collectively the "Waivers") which again increased the risk of high interest rates being paid to investors in USEL IV's ARS. The Fifth Waiver extended the waiver of interest rate caps on USEL IV's ARS from December 21, 2007 through March 1, 2008 (the "Fifth Waiver Period", together with the First Waiver Period,

Second Waiver Period, Third Waiver Period and Fourth Waiver Period, referred to below as the "Waivers Period"). For the Fifth Waiver Period, the Maximum Rate (the "Fifth Waiver Rate" together with the First Waiver Rate, Second Waiver Rate, Third Waiver Rate and Fourth Waiver Rate, referred to below as the "Waivers Rates") during the Fifth Waiver Period was set to an increased rate that equaled (i) one month LIBOR plus 300 basis points on Senior ARS and (ii) LIBOR plus 350 on Subordinate ARS. USEL's ARS interest rates immediately shot up yet an additional 150 basis points. The Waivers Period can be viewed as follows:

| Waivers Period | USEL III | USEL IV | Waiver Rates |
|---|---|---|---|
| October 1, 2007 – October 31, 2007 | | First Waiver | LIBOR plus 150 bps (Senior) / LIBOR plus 250 bps (Subordinate) |
| October 30, 2007 – January 1, 2008 | | Second Waiver | LIBOR plus 150 bps (Senior) / LIBOR plus 250 bps (Subordinate) |
| November 5, 2007 – December 5, 2007 | Third Waiver | | LIBOR plus 150 bps (Senior) / LIBOR plus 250 bps (Subordinate) |
| December 21, 2007 – January 31, 2008 | Fourth Waiver | | LIBOR plus 300 bps (Senior) / LIBOR plus 350 bps (Subordinate) |
| December 21, 2007 – March 1, 2008 | | Fifth Waiver | LIBOR plus 300 bps (Senior) / LIBOR plus 350 bps (Subordinate) |

57.    In procuring and inducing execution of each of the above Waivers, Carlson represented to Howard that if USEL agreed to the Waivers, that such agreement would eliminate the risk of an auction failure. Carlson also told Howard that if USEL did not sign the Waivers, (i) RBC would discontinue its longstanding role as backstop purchaser of USEL's ARS by no longer offering the Clearing Bid so that RBC would cause a failed auction, and (ii) any failed auction would prevent all future auctions of USEL's ARS on a permanent basis. However, underlying Carlson's direct representations, Carlson had a duty to and failed to disclose to USEL (i) that RBC's Management Group conclusively foresaw the ARS market collapsing, and (ii) RBC's true intentions and internal decision to withdraw from its established role of conducting the auctions and providing the Clearing Bid at the auctions of USEL's ARS. Carlson

misrepresented the facts about the continued auction process stated above, in order to induce USEL to sign waiver documents that benefited RBC, by allowing RBC to take advantage of the Waivers Rates of interest that would result from the Waivers and secretly increase RBC's ownership positions in ARS before exiting the ARS auction business to USEL's detriment.  In fact, RBC sought to sell its ARS business to another broker-dealer on or before December 13, 2007, before the Fourth or Fifth Waivers were even requested.

58.     In seeking to verify what RBC told Howard about the status of demand for USEL's ARS during the initial Waivers Period, on November 7, 2008, Howard asked Carwile by e-mail, "Grant.  Please identify by cusip, amount, and date acquired by RBC for Trust 3 and Trust 4.  Surely you can comply with this request which remains outstanding since September of 2007.  Thank you."  However, rather than respond truthfully that RBC was acquiring substantial amounts of USEL's Waiver Rate-paying ARS, Carwile concealed RBC's activities by misrepresenting:

I am sorry, Henry.  I don't understand your request.  This is the first I've heard of it, by the way.  What are you asking for me to tell you: the amount of ARS held by RBC in each of Trusts 3 and 4?  I will have no way, by the way, of tracking down the date the bonds were taken into inventory, if that is part of your question.  Thanks.

59.     On January 3, 2008, after USEL had already granted all five Waivers, Carlson finally confessed via email to USEL that indeed, RBC had accumulated huge amounts of USEL's ARS,

"You ask what our inventory of U.S. Ed paper was like. As of the close of business yesterday we held:

Trust III         18.8 million AAA  and 13 million A

Trust IV         248.2 million AAA  and 71.4 million A"

25